FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| GARY T. KENDELLEN, Regional Director of Region 22 of the National Labor Relations Board for and on behalf of the National Labor Relations Board,<br><br>             Petitioner,<br><br>v.<br><br>EVERGREEN AMERICA CORPORATION,<br><br>             Respondent. | 04-598 (WGB)<br><br>**O P I N I O N** |

Dorothy Foley, Esq.
Tara Levy, Esq.
NATIONAL LABOR RELATIONS BOARD, REGION 22
20 Washington Place, 5th Floor
Newark, NJ 07102

      Attorneys for Petitioner

Francis X. Dee, Esq.
John J. Peirano, Esq.
Irving L Hurwitz, Esq.
Willaim A. Cambria, Esq.
MCELROY, DEUTSCH, MULVANEY & CARPENTER
Three Gateway Center
100 Mulberry Street
Newark, New Jersey 07102-4079

      Attorneys for Respondent

**BASSLER, SENIOR DISTRICT JUDGE:**

Gary T. Kendellen, the Regional Director of Region 22 of the

National Labor Relations Board ("Board" or "Petitioner"),

petitioned this court for temporary injunctive relief pursuant to

Section 10(j) of the National Labor Relations Act (the "Act").

Section 10(j) authorizes United States district courts to grant temporary injunctions pending the Board's resolution of unfair labor practice proceedings. National Labor Relations Act § 10(j), as amended, 29 U.S.C.A. § 160(j).[1]

The Board alleges that Evergreen America Corporation ("Evergreen" or "Respondent") violated the Act by engaging in a campaign designed to undermine the efforts of Local 1964, International Longshoremen's Association, AFL-CIO ("Local 1964" or the "Union").  The alleged unfair labor practices include interrogating its employees regarding their union sympathies and the sympathies of other employees; threatening employees with plant closure or relocation, discharge, loss of benefits and other reprisals if they continued to support the Union; and undermining employee support for the Union by making unusually high, across the board, wage increases and promotions, providing

---

[1]The statute reads:

> The Board shall have power, upon issuance of a complaint as provided in subsection (b) of this section charging that any person has engaged in or is engaging in an unfair labor practice to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order.  Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

Christmas gift certificates, sponsoring lunches and picnics, and liberalizing the attendance and dress policies.

The Board seeks a cease and desist order to enjoin Evergreen from engaging in such unfair labor practices and a bargaining order requiring Evergreen to negotiate with the Union.

The Court has jurisdiction pursuant to 29 U.S.C.A. § 160(j) and venue is proper pursuant to 28 U.S.C.A. § 1391.

## I.   PROCEDURAL AND FACTUAL HISTORY

Evergreen's primary business consists of acting as general agent in North America for ocean steamship companies.  Its primary activities include generating sales, providing customer service, documentation, arranging for shipside operation and coordination of the inland distribution of cargo in North America.  In March 2002, David Chiang and Wayne Ting, two clerical employees of Evergreen, met with Local 1964, to discuss Local 1964's representation of Evergreen employees. Chiang and Ting explained that "management treated [Evergreen employees] unfairly, and . . . employees were concerned about their job security."  July 25, 2005 Opinion of Administrative Law Judge ("ALJ") 11:35-38.  In mid-April 2002, Local 1964 began seeking unionization from Evergreen employees

After holding a meeting on April 15, 2002, Local 1964 distributed authorization cards which would allow the Union to represent the employees.  The employees also formed an Organizing

Committee to circulate additional cards among the employees that
were not able to attend the meeting.  As a result of this
process, Local 1964 was able to obtain 66 authorization cards
from the employees.[2]  Believing that it held a majority of the
employees' votes, Local 1964 filed a petition with the NLRB on
June 4, 2002 seeking an election.  When the election was held on
July 17, 2002, however, the employees voted 61 to 52 against the
Union.  Local 1964 filed a charge against Evergreen on July 19,
2002, claiming that Evergreen had engaged in unfair labor
practices to prevent the employees from voting in favor of the
Union.

The Board issued its first Complaint against Evergreen on
December 31, 2002.  Labor 1964 filed additional charges and the
Board amended the original complaint several times.  The Fourth
Amended Complaint alleges that Evergreen violated Section 8(a)(1)
and (3)[3] of the Act by unlawfully interrogating employees,

_____

[2]The ALJ determined that there were 115 employees in the
bargaining unit as of June 15, 2002, which he deemed the
appropriate date for measuring majority status based on payroll
records. ALJ 13:8-11.

[3]Section 8(a)(1) makes it an unfair labor practice for an
employer "to interfere with, restrain, or coerce employees in the
exercise of the rights guaranteed in Section 7" of the Act to
organize or to refrain from such activities.  Section 8(a)(3)
makes it an unfair labor practice for an employer to discriminate
against employees because of the exercise of their Section 7
rights.  Section 7 provides that:

Employees shall have the right to self-organization, to
form, join, or assist labor organizations, to bargain

threatening them with plant closure, granting excessive wage

increases, promoting an excessive number of employees,

liberalizing its attendance policy and its dress code and

engaging in various other conduct in violation of the Act.

On February 13, 2004, the Board filed its petition for

Section 10(j) injunctive relief pending a final decision by the

Board.   Subsequently, this Court decided incorrectly to await the

conclusion of the administrative hearing before taking further

action.[4]

---

collectively through representatives of their own
choosing, and to engage in other concerted activities
for the purpose of collective bargaining or other
mutual aid or protection, and shall also have the right
to refrain from any or all of such activities except to
the extent that such right may be affected by an
agreement requiring membership in a labor organization
as a condition of employment as authorized in section
8(a)(3).

[4]See Fuchs v. Hood Ind., 590 F.2d 395 (1st Cir. 1979)
(holding that district court's decision to stay proceedings on
petition for temporary injunction pending decision of
administrative law judge without hearing to determine merits of
petition in light of nature of injunctive relief contemplated by
Section 10(j) of the NLRA was in excess of judicial discretion).

## II.  ALJ FINDINGS[5]

The ALJ ruled that as of June 15, 2002 the Union had attained majority status.[6]  The ALJ spent thirteen pages relating the testimony of the Organizing Committee and other employees concerning how authorization cards had been distributed and collected from employees in clerical positions (considered within the "bargaining unit") at Evergreen.[7]  The ALJ concluded that the

---

[5]Since the ALJ went into a detailed discussion of the facts of the case, this Court will not rehash them here, but will note those facts that are relevant to the Court's decision. Additionally, to the extent Evergreen suggests that the Court needs to make independent factual findings based on its own evidentiary hearing in its letter to the Court dated April 10, 2006, the Court notes that it may rely on the record of the Administrative Law Judge.  Eisenberg v. Honeycomb Plastics Corp., No 86-3484, 1987 WL 109093, at *1 (D.N.J. Jan. 9, 1987) (citing Squillacote v. Graphic Arts Int'l Union AFL-CIO, 540 F.2d 853, 860 (7th Cir. 1976).  The administrative record, developed over a 43-day trial,is an ample statement of the factual allegations in this case.

[6]Evergreen makes several assertions regarding the validity of the authorization cards and whether certain claims are time-barred.  Evergreen Memorandum in Opposition to the Application for Injunctive Relief ("Evergreen Opp. Mem.") at 22.   The Court's function is limited to a determination of whether contested factual issues could ultimately be resolved by the Board in favor of General Counsel.  Squillacote, 540 F.2d at 860. It is not the role of this Court to determine the merits of the Petitioner's case, therefore, the Court will not address these issues.  See supra at 13.

[7]The bargaining unit is all full time and regular part time office clerical employees employed at the Employer's office facility, including the following classifications/departments: documentation, general affairs, logistics, marine, projection, quality, financial, auditing, funds and accounting, import/export traffic and also logistics employees who work at the Maher Terminal in Jersey City, New Jersey but excluded all other employees, such as, port captains, assistant port captains,

testimony of those employees was credible and ruled that the

Board had "adduced sufficient evidence that 62 employees at

Respondent signed cards authorizing the Union to represent them."

ALJ 25:50-51.

The ALJ noted that when the Union began circulating campaign

literature, the literature was consistent with the fears of the

employees, which prompted them to seek Union representation.  ALJ

27:26-28.  Leaflets distributed by the Union stated that "union

representation would protect employees from job loss or from

Respondent moving, closing or relocating its facilities."  Id.

Another flyer emphasized that Evergreen had promised employees in

Tacoma and San Francisco that Evergreen would not move its

offices to Salt Lake City and that the employees' jobs were safe.

The flyer noted that Evergreen, however, did move the Tacoma and

San Francisco offices to Salt Lake City, but that the Los Angeles

employees, who had voted for a union, retained their jobs.  ALJ

28:16-22.

Evergreen responded by issuing its own flyer written with a

"Guarantee" attached, signed by President Thomas Chen.  The

guarantee stated that Evergreen had not threatened to move or

retaliate against the employees and issued a firm commitment to

---

engineers, confidential and managerial employees, sales employees
and sales coordinators, computer programmers, professional
employees, watchmen, guards and supervisors as defined in the
Act.

stay in New Jersey.  ALJ 29:24-32.

In stark contrast to these promises, several employees testified that they began to be interrogated by their supervisors regarding their support for the Union.  Chris Yu, a finance section employee, testified that her supervisor Kevin Huang called her the night before the election to say that if the employees chose the Union the company would close and asked if she knew how two of her co-workers felt about the Union [Tr. 1824].[8]  Yu further testified to several meetings between April and the election on July 17, 2002 in which Executive Vice President Raymond Lin threatened plant closure [Tr. 1890].  At the meeting, Lin purportedly asked the employees not to support the Union stating that if they joined the Union the company may close or move [Tr. 1838].  In addition, Yu was called into Lin's office and asked to support the company and not to join the Union [Tr. 1892-1895].

Yu's testimony was consistent with the testimony of Michelle Shen, who worked in the finance section.  Shen's supervisor was also Kevin Huang, who told Shen that the Union was no good for the company [Tr. 1745-1746].  Like Yu, Shen stated that she received phone calls at home from Huang, who had never called her before, asking her who was supporting the Union [Tr. 1741, 1755].

---

[8]Tr. is the abbreviation for the administrative hearing transcripts.

Shen testified that she was called to Vice President Lin's office and questioned about whether she was happy with her salary, which she had never been questioned about before [Tr. 1756].  After receiving a call from Lin the night before the election, Shen stated that she was too frightened to go to Union meetings or read Union flyers at work [Tr. 1762].  Neither Huang nor Vice President Lin testified at the administrative hearing.

Several other employees testified to similar experiences as Yu and Shen [See Tr. 288, 783, 1138, 2113, 2384].  In addition, Shirley Chiu and Kerry Bogran testified to being taken out to dinner and lunch during the organizing drive for the first time in their careers [Tr. 2746; 2755].  Jason Wu, Chiu's supervisor testified that he had taken employees to lunch before the Union began organizing, however his subpoenaed expense records did not support his claim [Tr. 5903].  Likewise, Kerry Bogran stated that she had never been out with her manager Ray Yen, until the organizing drive began.  Bogran's lunch with Yen was followed by a second invitation to lunch by managers Howard Tsung and Jack Wang.  Bogran testified that she was asked about the Union and whether people were concerned about the company moving [Tr. 2758].  Although Tsung asserted that he had taken employees out for meals prior to the organizing drive he could not remember the name of one employee, the place that they went or who paid the bills [Tr. 5721].

The Fourth Amended Complaint further alleges that the company solicited grievances and made promises in an effort to undermine Union support.  Mike Gunshefsky who worked in the traffic export section testified that his boss, Guy Siniscalchi, along with the Junior Vice-President Dan Grogg met with Gunshefsky's group and asked what changes the employees wanted to see [Tr. 1140].  Gunshefsky noted that he was informed that management wanted to form an employee committee to speak with management about employee requests [Tr. 1444].  Additionally, Gunshefsky stated that at a group meeting, comprised of about 50 employees, President Thomas Chen stated that the Union was not good for the company, the Union was full of mobsters, and that the company would make the changes that the employees wanted, rendering a Union unnecessary [Tr. 1145].

As a result of conversations (held at lunches and dinners) with its employees, Evergreen implemented a year round casual dress policy, employees were allowed to use sick leave to care for family members, which employees could not do before the organizing drive and time and attendance policies became more flexible.  The record contains substantial testimony regarding the increase in social events that Evergreen instituted, including a company sponsored Fourth of July barbecue, a luau in September and several free breakfasts, lunches and dinners. Evergreen also changed its longstanding policy that did not allow

10

spouses to attend the company's Christmas dinner.  It also

provided each employee with a $400 gift card.  Additionally,

Evergreen extended a company-wide pay increase of $400 to each

employee on July 15, 2002 and made a number of promotions.

On July 25, 2005, the ALJ made the following findings of

fact and conclusions of law:

> 3.  By coercively interrogating its employees,
> concerning their activities on behalf of the Union or
> how they intended to vote in an NLRB election,
> threatening its employees with plant closure, loss of
> jobs, loss of benefits, or other unspecified reprisals
> because of their union activities, soliciting
> grievances from employees, while impliedly promising to
> remedy such grievances, promising its employees raises,
> promotions, changes in its grievance procedure, changes
> in sick leave procedure, or other improvements in their
> terms and conditions of employment, in order to
> persuade them to not support the union, ordering and
> instructing its employees not to attend union meetings,
> read union literature and to throw such literature in
> the garbage, and by creating the impression that the
> union activities of its employees are under
> surveillance, Respondent has violated Section 8(a)(1)
> of the Act.
>
> 4.  By granting excessive across the board increases to
> its employees, and excessive amounts of promotions on
> July 1, 2002, and by granting other benefits such as
> allowing its employees to make up for 10 minutes of
> lateness by making up the time at the end of the day,
> allowing employees flextime schedules, posting job
> vacancies on its electronic bulletin Board, changing
> its policy of casual dress, permitting employees to use
> sick days to care for a family member and to carryover
> unused sick days to the following year, permitting
> employees to substitute Good Friday for Martin Luther
> King day as a paid holiday, changing the age limit for
> its voluntary separation program, allowing employees to
> bring spouses or guests to Respondent's year end
> Holiday party, and distributing a $400.00 gift
> certificate to all employees in December of 2002, in
> order to discourage employees from supporting the

> Union, Respondent has violated Section 8(a)(1) and (3)
> of the Act.

ALJ 145:25-46.[9]  Based on its findings, the ALJ ruled that it

would recommend that the election be set aside and that a

bargaining order be imposed.

## III.   10(j) INJUNCTIVE RELIEF STANDARD

To grant interim injunctive relief under § 10(j) a district

court must determine: (1) whether there is "reasonable cause" to

believe that unfair labor practices have been committed; and (2)

whether the injunctive relief sought is "just and proper."

Unlike a preliminary injunction, to obtain a 10(j) injunction,

the Regional Director of the Board need not show irreparable harm

or the likelihood of success on the merits.  Kobell v. Suburban

Lines, Inc., 731 F.2d 1076, 1084 (3d Cir. 1984).

### A.   Reasonable Cause Standard

The reasonable cause standard requires the district court to

find: (1) that the Regional Director's case depends upon a

substantial, non-frivolous legal theory, implicit or explicit;

and (2) that there is sufficient evidence, taking the facts

_____

[9]Petitioner also alleged that Evergreen fired Gunshefsky for
his participation in the Union campaign.  The ALJ, however, did
not find that Gunshefsky's termination was an unlawful practice.
ALJ 131:20-21.  Gunshefsky was fired for cursing, but had been
suspended once prior to his termination and had received warnings
regarding similar conduct before.  Although the ALJ noted that he
might believe that terminating an employee for cursing is unfair
or unjust, he would not substitute his judgment for the
employer's as to what constitutes appropriate discipline.
ALJ:1319-13.  This Court agrees.

favorably to the Board, to support that theory.  Id.  The
district court's sole function in this respect is to determine
whether the Board could ultimately resolve any contested factual
issues raised by the evidence presented in favor of the
Petitioner.  Fuchs, 590 F.2d at 397.  The district court should
not attempt to resolve disputed facts or determine the
credibility of witnesses.  Schauffler v. Local 1291, Int'l
Longshoremen's Ass'n, 292 F.2d 182, 186 n.4 (3d Cir. 1961).  The
ultimate determination with respect to issues of both fact and
law, is reserved exclusively for the Board, subject to review by
the Court of Appeals pursuant to §§ 10(e) and (f) of the Act.

The evidence supports the Petitioner's position that
Evergreen threatened its employees with plant closure or
relocation, discharge, loss of benefits and other reprisals if
they continued to support the Union.  Debbie Reynolds Hotel,
Inc., 332 NLRB 466 (2000) (ruling that it is a violation of §
8(a)(1) to threaten employees with plant closure in the event of
unionization); Rossmore House, 269 NLRB 1176 (1984) (finding that
it is a violation of § 8(a)(1) to interrogate employees about
their interests in unionization if the interrogation reasonably
tends to interfere with, restrain, or coerce employees in the
exercise of their Section 7 rights).

The evidence also supports Petitioner's assertion that
Evergreen offered its employees benefits to undermine the efforts

of the Union.   The Court recognizes that the mere grant of benefits during the campaign drive is not, per se, grounds for setting aside an election.   See Noah's Bay Area Bagels, LLC, 331 NLRB 188, 189 (2000).   The critical inquiry, however, is "whether the benefits were granted for the purpose of influencing the employees' vote in the election and were of a type reasonably calculated to have that effect."   Id.   The Court finds that there is reasonable cause to believe that Evergreen's actions were intended to influence employees not to vote for the Union.

Evergreen claims that the allegations of threats are based solely on "isolated snippets" or "isolated interrogation[s]" of its employees.   Evergreen Opp. Mem. at 22, 31.   The Court notes that several Evergreen employees testified that threats regarding plant closure were made at group meetings or group lunches and dinners.   Nevertheless, the isolated discussions that Evergreen employees testified about having with supervisors and top management officials are no less supportive of Petitioner's claim that there is reasonable cause to believe that Evergreen violated § 8(a)(1) and (3) of the Act.

Evergreen further argues against the claims that it threatened loss of jobs asserting that the evidence shows that Evergreen "scrupulously honored [its] commitment" not to commit any reprisals against employees regardless of the outcome of the election.   Evergreen Opp. Mem. at 13.   This argument is not

14

persuasive: the fact that Evergreen did not fire any of its employees after the election does not prove that Evergreen did not threaten to do so before the election.

Based on the extensive testimony provided in the administrative record, the Court finds that there is reasonable cause to believe that Evergreen committed unfair labor practices.

## B.  Just and Proper Standard

Injunctive relief is "just and proper" under § 10(j) "when the nature of the alleged unfair labor practices are likely to jeopardize the integrity of the bargaining process and thereby make it impossible or not feasible to restore or preserve the status quo pending litigation."  Pascarell v. Vibra Screw, Inc., 904 F.2d 874, 878 (3d Cir. 1990).  The critical question the Court must answer is: absent an injunction, will the Board's ability to facilitate peaceful management-labor negotiations be impaired?  In addition, the Court must give deference to the Board's determination that the integrity of the bargaining process requires interim protection.  Id. at 879, n.7.

Evergreen argues that the bargaining order[10] requested by Petitioner is not necessary to effectuate the remedial purposes of the Board.  Evergreen Opp. Mem. at 27.  The Court disagrees. In Moore-Duncan v. Horizon House Developmental Services, 155 F.

---

[10]The Supreme Court in NLRB v. Gissel Packing Co., 395 U.S. 575 (1969), discussed the standard for imposing a bargaining order.

Supp. 2d 390, 396 (E.D. Pa. 2001), the court imposed a bargaining

order finding that:

> The bargaining process is harmed when an employer's
> actions weaken a union, and that union's ability to
> provide effective representation is diminished.   If
> the union cannot negotiate for better terms and
> conditions of employment, the interest of the employees
> in representation will dissipate.  The impotence of the
> union and the loss of employee interest can create a
> mutually reinforcing cycle, as a lack of support among
> employees further diminishes the union's strength and,
> consequently, its ability to press for improvements
> that would demonstrate its worthiness to the members of
> the bargaining unit.  If negotiations are eventually
> ordered by the N.L.R.B. at the end of the
> administrative process a union which has been weakened
> in the interim by the employer's actions will be hard-
> pressed to secure improvements in wages and benefits at
> the bargaining table.

(citing NLRB v. Schill Steel Products, Inc., 480 F.2d 586, 590

(5th Cir. 1973).

Evergreen also contends that a bargaining order is not

necessary with the passage of three years (now four years) since

any of the alleged unlawful conduct occurred.  This argument

weighs against its position.  As the court stated in Horizon

House Developmental Services, the Union's ability to represent

its employees will continue to weaken until the Board makes its

determination.  Therefore, this Court finds that it is in the

public interest to grant a bargaining order.  See Moore-Duncan,

155 F. Supp. 2d at 396.  An injunction would temporarily restore

the parties to their respective situations prior to the

respondent's allegedly unlawful behavior.  Moreover, an interim

bargaining order will not impose significant burdens on
Evergreen, as it suggests, because any contract can be made
subject to recision in the event that the Board should dismiss
the complaint and determine that Evergreen acted lawfully.  See
Pascarell v. Gitano Group, 730 F.Supp. 616, 625 (D.N.J. 1990).

Evergreen further argues that the Court should allow the
Board to address the circumstances by using the traditional
remedies, which the court in Hialeah Hospital, 343 NLRB No. 52
2004 WL 2461358, at *1 (2004)-relied on heavily by
Evergreen-found effective.  In Hialeah Hospital, the Board
disagreed with the ALJ, finding that a bargaining order was
unnecessary because the coercive effects of the Respondent's
unlawful conduct could be erased, and a fair rerun election
ensured by the use of traditional remedies.  Id.  The court
distinguished the facts of its case-where the bargaining unit
consisted of only 11 employees, only one employee was fired
unlawfully and the company conducted surveillance on one
employee-from those cases where many unlawful interrogations had
occurred and numerous threats of plant closure had been made.
Id., at *6 (citing Adam Wholesalers, Inc., 322 NLRB 313 (1996);
Flexsteel Ind., 316 NLRB 745; Electro-Voice, Inc., 320 NLRB 1094
(1996)).

The Court finds that the present case is comparable to those
cases which the Hialeah Hospital court distinguished from its

17

case and where extraordinary circumstances were found to justify

a bargaining order.  In Garney Morris, Inc., 313 NLRB 101, 102

(1993), the court noted that in making its decision, the Board

may properly consider "the extensiveness of the unfair labor

practices in terms of their continuing effect on election

conditions and the likelihood of their recurrence in the future

to determine if the conduct has a tendency to undermine majority

strength and impede the use of traditional remedies." (citing

Gissel Packing Co., 395 U.S. at 614-15).

Top employees in Evergreen's management talked to numerous

employees about plant closures and the danger of joining the

Union.  These threats along with the numerous benefits that

Evergreen provided to encourage employees not to join the Union

have created a situation in which the Union will continue to lose

its bargaining power if a bargaining order is not imposed.  In

fact, Evergreen has committed hallmark violations by making

threats of plant closure and offering wage increases and

promotions far beyond what it regularly made, which courts have

found justify a bargaining order.  M.J. Metal Products, Inc., 328

NLRB 1184 (1999).  The Court is convinced that a bargaining order

is necessary.[11]

---

[11]Evergreen asserted at oral argument on April 12, 2006 that
changed circumstances also weigh against a finding that a
bargaining order is just and proper.  The Court does not find
that these circumstances justify not imposing an order where
Evergreen engaged in numerous unfair labor practices making a

**IV.   CONCLUSION**

In conclusion, the Court finds that (1) there is reasonable cause to believe that Evergreen committed unfair labor practices and (2) the injunctive relief and bargaining order requested by the Board are just and proper.  Therefore, the Court **grants** the Board's petition for a temporary injunction.

An appropriate Order accompanies this Opinion.


 /s/ William G. Bassler
WILLIAM G. BASSLER, U.S.S.D.J.


Dated: April 12, 2006

---

bargaining order necessary to remedy its conduct.